James A. MULVEY, Appellant,

v.

SAMUEL GOLDWYN PRODUCTIONS et al., Appellees.

No. 24157.

United States Court of Appeals, Ninth Circuit.

Oct. 20, 1970.

As Modified on Denial of Rehearing Dec. 1, 1970.

---

Peter J. Donnici (argued), Maxwell M. Blecher, Law Offices of Joseph L. Alioto, San Francisco, Cal., for appellant.

Martin Gang (argued), Frank G. Wells, Gang, Tyre & Brown, Hollywood, Cal., for appellees.

Before BARNES and HUFSTEDLER, Circuit Judges, and PECKHAM,* District Judge.

HUFSTEDLER, Circuit Judge:

Appellant James A. Mulvey appeals from a judgment dismissing from his complaint his first claim for relief brought under section 4 of the Clayton Act, 15 U.S.C. § 15, charging appellees

---

* Hon. Robert F. Peckham, United States District Judge for the Northern District of California, sitting by designation.

with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, thereby causing a diminution of the value of his contractual rights in five motion picture films. Judgment was entered after Goldwyn successfully moved for summary judgment on that claim.[1]

The following facts are undisputed. On December 28, 1948, Mulvey, the sole owner of the motion picture "Pride of the Yankees" (hereinafter "Pride"), sold his entire interest to Samuel Goldwyn Productions, Inc., for $1,500,000. By the terms of their agreement, the Goldwyn corporation was to pay Mulvey $100,000 down and the balance in semiannual payments equal to 82½ percent of the net receipts generated by the film's distribution. However, if the percentage Mulvey was entitled to receive should not aggregate $1,500,000 by September 30, 1973, the parties agreed to reduce the purchase price to the total sum of the receipts then due to Mulvey.

On September 8, 1951, Mulvey transferred his undivided 10 percent interest in four other motion pictures to the Goldwyn corporation for $400,000. The agreement provides the same plan of payment as for "Pride," except that the down payment was $51,248 and the payment period extends to July 1, 1976.

The Goldwyn corporation was thereafter dissolved, and its interest in the five films and its contractual obligations to Mulvey were acquired by Samuel Goldwyn Productions, a limited partnership, in which Samuel Goldwyn was the sole general partner. Goldwyn packaged the films with forty-five other films he owned, and he licensed the bundle ("Samuel Goldwyn Library of Films for Television") for television exhibition beginning about 1960.

For purposes of this appeal, Goldwyn concedes that he block booked the library and that that block booking was a violation of section 1 of the Sherman Act.

---

1. The remaining counts of Mulvey's complaint are separate from and independent of the first; no issue on appeal is raised in respect of those counts.

(*See, e. g.,* United States v. Loew's Inc. (1962) 371 U.S. 38, 44–52, 83 S.Ct. 97, 9 L.Ed.2d 11; United States v. Paramount Pictures, Inc. (1948) 334 U.S. 131, 156–159, 68 S.Ct. 915, 92 L.Ed. 1260.)

Mulvey contends that Goldwyn's block booking was a cause of his receiving only $740,800.95 on his contracts, instead of a price more nearly approximating the $1,900,000 contractual maximum.

Two issues are dispositive of this appeal: Did the district court err in holding as a matter of law that (1) there was no causal connection between the alleged diminution of the value of Mulvey's contractual rights in the five films and Goldwyn's block booking of those films, and (2) Mulvey has no standing to invoke section 4 of the Clayton Act, because he was not in the "target area" of the economy affected by the block booking? We answer both questions affirmatively.

Goldwyn's causation argument is two-pronged: First, he says that he was not under any contractual obligation to produce any income from the films; therefore, he cannot be liable for his failure to produce more money from the distribution of the films than he actually did, and therefore Mulvey cannot be said to have suffered injury from the method Goldwyn used to distribute the films. Second, he says that if he were under contractual duty to distribute and to maximize the net receipts from the photoplays, the breach of the contracts was the "controlling" cause of Mulvey's claimed injury and, therefore, the block booking was not the legal cause of his injury.

The arguments are specious. We assume, *arguendo,* that Goldwyn would not have been liable to Mulvey on any theory had he kept the five photoplays in his vault. But that is not what he did. He distributed them, using a method that violated section 1 of the Sherman Act. It is immaterial that block booking was or was not a breach of contract. Successful maintenance of an antitrust suit does not depend upon the availability or nonavailability of a common-law remedy for that wrong. The antitrust laws are an expression of federal public policy to foster free competition. The treble-damage action was designed to implement that policy by encouraging private suitors to enforce the antitrust laws and thereby to deter potential violators from undertaking the forbidden conduct. That purpose would be frustrated by remitting to his common-law remedies one who has been injured by such conduct. (*Cf.* Karseal Corporation v. Richfield Oil Corporation (9th Cir. 1955) 221 F.2d 358.)[2]

The breach of a contract may become relevant to the causation issue in an antitrust suit between the contractors, when the breach consists of conduct other than that constituting the antitrust violation and when there is evidence that the nonantitrust wrong, not the antitrust violation, was the legal cause of the injury.[3] That is not our

---

2. To the extent that VTR, Inc. v. Goodyear Tire & Rubber Co. (S.D.N.Y.1969) 303 F.Supp. 773 purports to state a different principle, we disapprove it.

3. If the damages flowed solely from the contractual breach and that breach was not based on conduct that violated the antitrust laws, the antitrust action will be defeated for want of any causal connection between the claimed wrong and the injury. (*E. g., see* Continental Ore Co. v. Union Carbide & Carbon Corp. (1962) 370 U.S. 690, 695–702, 82 S.Ct. 1404, 8 L.Ed.2d 777; SCM Corp. v. Radio Corporation of America (2d Cir. 1969) 407 F.2d 166, 170–171, cert. denied (1969) 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d

461.) Legal cause exists between the antitrust wrong and the injury if that wrong is a substantial factor in bringing about the injury. It need not be the sole or the "controlling" cause of the injury. (Ford Motor Co. v. Webster's Auto Sales, Inc. (1st Cir. 1966) 361 F.2d 874; Haverhill Gazette Co. v. Union Leader Corp. (1st Cir. 1964) 333 F.2d 798, 802 n. 4, cert. denied (1964) 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343; E. V. Prentice Machinery Co. v. Associated Plywood Mills (9th Cir. 1958) 252 F.2d 473, cert. denied (1958) 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844.)

If the damages flowed in part from the nonantitrust wrong and the antitrust wrong was not a substantial factor in

case. The only wrong of which Mulvey complains is Goldwyn's block booking.

■ We turn to Goldwyn's standing argument. In pertinent part, section 4 of the Clayton Act provides: "Any person who shall be injured in his * * * property *by reason of* anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained. * * *" (Emphasis added.) The italicized language has been judicially construed to embrace not only the legal causation element, but also the standing concept, which in this setting is a close relative of causation. It is a relationship that has not received a blessing by the Supreme Court. (*See* Hoopes v. Union Oil Company of California (9th Cir. 1967) 374 F.2d 480, 485.) But the Court has not expressly overturned the decisions of the Courts of Appeals restricting the right to maintain a section 4 Clayton Act suit to those persons who are "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." (Conference of Studio Unions v. Loew's, Inc. (9th Cir. 1951) 193 F.2d 51, 54–55, cert. denied (1952) 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687; *accord,* Hoopes v. Union Oil Company of California, *supra;* Twentieth Century Fox Film Corp. v. Goldwyn (9th Cir. 1964) 328 F.2d 190, cert. denied (1964) 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87; Karseal Corp. v. Richfield Oil Corp., *supra.*) It is unnecessary for us here to decide how much the restrictive decisions may have been eroded by the Supreme Court, because Mulvey's claim meets even the restrictive tests. The district court concluded that Mulvey was neither a supplier of

motion pictures to television nor a customer in the market for such pictures and therefore was not within the area of the economy endangered by a breakdown of competitive conditions; Goldwyn's acts of licensing were aimed at television stations.

But Mulvey was "hit" as squarely as were *Karseal* and *Hoopes*: He was neither sideswiped nor struck by a carom shot. He was within the area "which it could reasonably be foreseen would be affected" by block booking. (Twentieth Century Fox Film Corp. v. Goldwyn, *supra,* 328 F.2d at 220.)

Block booking enables a distributor to obtain greater revenue from less desirable films by forcing an exhibitor who desires other films to take the entire package. An exhibitor who refuses to accept the less desirable films will be denied the films of greater worth. Block booking thereby enhances the market value of those films of lesser intrinsic merit. If exhibitors refuse to accept the entire package, the revenue normally generated by the more desirable films will be substantially reduced.

Goldwyn directed his activities at the means of distributing films in order to affect their individual revenue-producing potentials—the target area. Mulvey's films are within this target area. Consequently, it is entirely foreseeable that Goldwyn's block booking could impair the profit potential of Mulvey's films, thus depreciating the value of Mulvey's contractual interest in the films' revenue.[4]

No discussion of the collateral points is necessary in view of our disposition of the central issues.

The judgment is reversed.

---

producing that part, damages for the antitrust wrong will be accordingly diminished.

It would be a rare case indeed in which such questions could be resolved as a matter of law. (*See* Perkins v. Standard Oil Co. of California (1969) 395 U.S. 642, 648–649, 89 S.Ct. 1871, 23 L.Ed.2d 599; Continental Ore Co. v. Union Carbide & Carbon Corp., *supra,* 370 U.S. at

700–701, 82 S.Ct. 1404; Radovich v. National Football League (1957) 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456.)

4. We disagree with the contrary conclusion on the standing issue reached by the Second Circuit, per curiam, in Fields Productions, Inc. v. United Artists Corp. (1970) 432 F.2d 1010.