Thomas R. LAUGHLIN, Delores Taylor Laughlin, National Student Film Corporation, a California Corporation, Taylor Laughlin Distribution Company, a California Corporation, and Avondale Productions, Inc., a California Corporation, Plaintiffs,

v.

Frank WELLS, Warner Brothers, Inc., a Delaware Corporation, and National Broadcasting Company, Inc., a Delaware Corporation, Defendants.

No. CV 76–2988–RMT.

United States District Court, C. D. California.

Jan. 6, 1978.

Supplemental Memorandum Feb. 2, 1978.

Harold J. Kwalwasser, Tuttle & Taylor Inc., Los Angeles, Cal., Myron M. Cherry, Chicago, Ill., for plaintiffs.

Stanley P. Gold, Gang, Tyre & Brown, Stuart L. Kadison, Dale S. Pryweller, Kadison, Pfaelzer, Woodward, Quinn & Rossi, Los Angeles, Cal., for defendants Wells & Warner Bros.

Philip W. Boesch, Jr., Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant NBC.

MEMORANDUM

TAKASUGI, District Judge.

Defendants Frank Wells and Warner Bros. Inc.[1] move this court for a summary judgment to dismiss Counts I and III of the Amended Complaint which allege violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[2] Defendants claim that plaintiffs, as mere profit participants, lack standing to sue under Section 4 of the Clayton Act, 15 U.S.C. § 15.[3]

Approximately a year ago, in this case, this court, citing *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), rejected a similar argument and ruled that plaintiffs did, in fact, have standing to pursue their antitrust claims.[4] What is new in the instant motion is defendants' contention that two cases decided subsequent to this court's ruling last year, in effect, overrule *Mulvey* and apply a stricter standing requirement under Section 4, a requirement which plaintiffs cannot meet. The two cases are *Brunswick v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) and *Lenore v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir. 1977).

I

While there are significant factual disputes in this case, for the sole purposes of this motion defendants admit that all the facts alleged in the Amended Complaint are true.

In 1971 a Production-Financing-Distribution Agreement (the "P–F–D Agreement")

1. Defendant National Broadcasting Company also filed a motion for summary judgment in this matter, concurring in all parts with the Memorandum filed by defendants Wells and Warner Bros. Inc.

2. On May 23, 1977, plaintiffs filed a voluntary dismissal of Count II of the Amended Complaint. Defendants claim that since Count IV is joined in the Amended Complaint solely pursuant to the doctrine of pendent jurisdiction, if this court grants summary judgment as to

Counts I and III, Count IV must also be dismissed for lack of jurisdiction.

3. In pertinent part, Section 4 provides:
   "Any person who shall be injured in his . . property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . .."

4. See Findings of Fact and Conclusions of Law, Conclusion 1, filed November 9, 1976.

was entered into between plaintiff, Thomas R. Laughlin, the producer of the then contemplated Film ("Billy Jack"), and defendant Warner Bros. Inc. Under the P–F–D Agreement, Warner was granted exclusive rights to distribute the Film both theatrically and on television, while Laughlin was entitled, in part, to receive, after certain deductions, 45% of the gross receipts of the Film. Between 1971 and 1975 the Film was distributed theatrically and was a financial success for both parties.

In late 1975 a dispute arose as to how next to distribute the Film. Warner wanted to license it for television, while Laughlin thought it still had profit potential theatrically.

Much dispute as to what happened next enters at this point. An agreement of contested validity was entered into on February 20, 1976, whereby Laughlin is said to have exchanged his 45% share of the first run of the Film on television for $600,000. However, since for the purposes of this motion, defendants are not contesting plaintiffs' Amended Complaint on a factual basis, it can be assumed that plaintiffs maintained a percentage interest in the television gross.

On February 23, 1976, Warner licensed fifteen pictures to NBC for $19,000,000. One of the pictures was the Film for which NBC paid $1,500,000. Plaintiffs allege, and it is admitted for this motion, that the licensing of these pictures constituted an illegal tying arrangement prohibited by Section 1 of the Sherman Act.

## II

*THE MULVEY CASE:* Mulvey, the sole owner of the Film "Pride of the Yankees," sold his interest in it to Goldwyn Productions for $1,500,000 to be paid over time. He also sold to Goldwyn Productions his interest in four other Films for $400,000. As part of the agreement, if the percentage Mulvey was to receive was less than these amounts based on income from the Films up to a certain date, the parties agreed to reduce the purchase price. Goldwyn packaged the Films with 45 others for sale to television. Mulvey claimed that Goldwyn block booked the library and that was a cause of his receiving a lesser amount than the $1,900,000 contractual maximum. For the purposes of the appeal defendant conceded that he block booked the total library and that that violated Section 1 of the Sherman Act.

In holding that Mulvey had standing, the court applied a *target area* test. It reversed the district court which had held that Mulvey was neither a supplier of motion pictures to television nor a customer for such pictures and, therefore, was not within the area of the economy endangered by a breakdown of competitive conditions.

The *Mulvey* court found that Mulvey was squarely hit, "[h]e was neither sideswiped nor struck by a carom shot." 433 F.2d at 1076. The court concluded:

> "Goldwyn directed his activities at the means of distributing films in order to affect their individual revenue-producing potentials—the target area. Mulvey's films are within this target area." *Id.*

Defendants in *Mulvey* claimed, as they do in the case at bar, that plaintiffs' only claim is a contractual, not an antitrust claim. Warner Bros. asserts that Laughlin's only claim would be one of improper allocation, *i. e.,* that he received too small of "a share of the pie" out of the total package sale to NBC. The *Mulvey* court rejected this argument, stating that the availability of a common law remedy does not preclude an antitrust action and that an antitrust remedy was available to plaintiffs.

On the basis of this analysis, this court last year found that plaintiffs, in the case at bar, also had standing. A careful review of *Brunswick* and *Lenore* does not change that perception.

## III

■ *THE BRUNSWICK CASE:* [5] Plaintiffs were operators of bowling centers who

---

5. Both *Brunswick* and *Lenore* were decided under Section 7 of the Clayton Act, which is a prophylactic measure which proscribes mergers whose effect "may be substantially to less-

brought suit against defendant Brunswick Corp. which had acquired a number of bowling centers when the bowling industry took a downturn and the previous owners of the centers were unable to continue making payments to defendant on the equipment they were purchasing from it. The Court in finding that plaintiffs lacked standing stated that Congress did not intend to allow treble damages for all dislocations caused by unlawful mergers. Instead, "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. . . . It should, in short, be 'the type of loss that the claimed violations . . would be likely to cause.' [citation and footnote omitted]." 97 S.Ct. at 697.

In *Brunswick*, plaintiffs' "loss" (decreased profits because the bowling centers were continued in operation by Brunswick instead of being allowed to go under) would have been the same if the centers were acquired by shallow pocket buyers instead of the deep pocket of Brunswick. Yet if the purchases were unlawful it was because they were made by a deep pocket in a market of economic pygmies. Therefore, plaintiffs' injury was not caused by that which made the acquisition unlawful, it was not an antitrust injury.

*THE LENORE CASE:* Similarly in *Lenore,* the Ninth Circuit found that while plaintiffs' injury may have occurred "by reason of" the unlawful acquisition, it did not occur "by reason of" that which made the acquisition unlawful. Plaintiffs were not within the class of persons whom Congress intended to protect by Section 7.

In *Lenore* plaintiffs were wholesale distributors of beer who, after the acquisition of one brewery by another, were terminat-

ed. The court found no direct relationship between the acquisition qua antitrust acquisition and the injury, the termination of the distributors. While the acquisition may have led to the termination, the termination was not caused "by reason of" that which made the acquisition unlawful.

*Lenore* continued the long standing "target area" approach to standing in antitrust actions in the Ninth Circuit. *Blankenship v. Hearst Corp.,* 519 F.2d 418, 426 (9th Cir. 1975); *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir. 1973), *cert. denied, sub nom. Morgan v. Automobile Manufacturers' Assn.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Mulvey, supra;* and, most recently, *Bosse v. Crowell, Collier & MacMillan,* 565 F.2d 602 (9th Cir. 1977).[6]

### IV

*Brunswick* and *Lenore* state that Section 4 is primarily a remedial provision. *Mulvey,* on the other hand, had emphasized that "[t]he treble-damage action was designed to implement that policy [of fostering free competition] by encouraging private suitors to enforce the antitrust laws and thereby to deter potential violators from undertaking the forbidden conduct." 433 F.2d at 1075.

It could be argued that *Brunswick's* and *Lenore's* approach represents a basis for a more restrictive view of standing than that represented by *Mulvey*. However, the Supreme Court also found that "[o]f course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed [citations omitted]." 97 S.Ct. at 696.

All of these purposes must be taken into account in understanding the Congressional

---

en competition, or to tend to create a monopoly." *Brunswick*, 97 S.Ct. at 695. It is intended primarily to arrest consequences of intercorporate relationships *before* those relationships can work their evils. This is a different section than that before this court. The decision of this court in the case at bar however makes it unnecessary to decide whether these two decisions are limited only to Section 7 actions.

**6.** *Lenore,* which follows *Brunswick,* cites *Blankenship* with approval, while *Blankenship* cites *Mulvey's* approach to this issue with approval. *Bosse* cites both *Lenore* and *Blankenship* with approval. This surely weakens defendants' contention that, after *Brunswick,* this Circuit has rejected *Mulvey.*

intent in relation to standing under Section 4. If the newer cases do represent a more restrictive view of standing, that can only be translated in the tests they propound and the holdings they articulate.

■ As is discussed *supra,* the target area test used in *Mulvey* remains applicable in this Circuit.

The specific factual circumstances of *Brunswick* and *Lenore* differ significantly from the circumstances in *Mulvey* and the case at bar. In the former cases the plaintiffs were unable to show *antitrust* injury: in *Brunswick* plaintiffs would have suffered the identical "loss" even if an economic pygmy had purchased the bowling centers; in *Lenore* there was no direct connection shown between that which may have made the acquisition unlawful and the termination of the dealers. In essence, the test is one of *causation,* i. e., was plaintiffs' injury *caused* by the *antitrust* violation? As the Supreme Court explained in *Brunswick,* it is not enough to show, under Section 7, any loss causally linked to the mere presence of the violator in the market. 97 S.Ct. at 696. Congress, the Court found, did not intend "to mandate damage awards for all dislocations caused by unlawful mergers." *Id.* at 697. Instead, plaintiff must prove that his or her injury was caused by an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*

■ Block booking [7] reduces competition for the more desirable film by eliminating competitors who will not or cannot buy the whole block. Plaintiffs, in the case at bar, are injured directly by this lessening of competition. Block booking increases the value of the less desirable films at the expense of the more desirable films. Plaintiffs are injured directly by this parasitic borrowing of value. Plaintiffs' injury arises as a direct result of, is caused by, the *antitrust* violation. If there were no antitrust violation, no restraint of trade in the tying product, no loss of a free, competitive market, plaintiffs' alleged injury would not have occurred. Plaintiffs are claiming an antitrust injury and thus, under the tests set forth in *Brunswick, Mulvey* and *Lenore,* have standing.

Defendants claim that plaintiffs are really in court because they do not like the allocation they received out of the amount paid Warner Bros. by NBC for the total block. This, defendants urge, is not an antitrust claim. But this misses the point. Plaintiffs are arguing that it was the illegal tying arrangement that caused their receiving less money than they would have otherwise received absent the arrangement. Of course, plaintiffs must prove this. But this allegation meets the target area test of this Circuit; it meets the *Brunswick* test.[8]

Plaintiffs' alleged injury is "the type of loss that the claimed violations  .  .  .

7. *Mulvey* explains block booking thusly:

"Block booking enables a distributor to obtain greater revenue from less desirable films by forcing an exhibitor who desires other films to take the entire package. An exhibitor who refuses to accept the less desirable films will be denied the films of greater worth. Block booking thereby enhances the market value of those films of lesser intrinsic merit. If exhibitors refuse to accept the entire package, the revenue normally generated by the more desirable films will be substantially reduced." 433 F.2d at 1076.

8. Defendants characterize plaintiff as a "mere profit participant" and cite cases (some from other Circuits), where a shareholder (whose only damage was the reduction in value of his stock), a corporate officer, a creditor (where direct injury was incurred by the debtor), a lessor (where immediate injury was incurred by the lessee), and a patentee (whose injury

was experienced first by his licensee) were denied standing, to support their position that plaintiffs too should be denied standing. See defendants' Memorandum at 9. But, this contention runs counter to *Mulvey,* where plaintiff, who occupied a position similar to Laughlin, was found to have standing by this Circuit. Additionally, this contention misses the point of the difference in roles between these factual conditions and the instant case. Laughlin is not suing in an indirect role for an injury to himself sustained through another person or entity. The injury is direct. Recently this Circuit in *Bosse v. Crowell, Collier & MacMillan, supra,* found that plaintiffs who sued in their individual capacities, yet were not in the musical instrument production business in any way except as shareholders, officers and directors of the corporation acquired by defendants, lacked antitrust standing. The court emphasized that plaintiffs sued in their individual capacity, not through a shareholders' deriva-

would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), *quoted in Brunswick,* 97 S.Ct. at 697.

Plaintiffs have standing. The motion for summary judgment is denied.

## SUPPLEMENTAL MEMORANDUM

THE COURT'S analysis, *supra,* of the purposes of treble damage recovery under Section 4 of the Clayton Act has received support from the United States Supreme Court in an antitrust case decided within a week of the issuance of this court's Memorandum on January 6, 1978. *Pfizer, Inc. v. Government of India,* —— U.S. ——, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).

This court noted in Part IV of the Memorandum that while *Brunswick* had stated that section 4 is primarily a remedial measure and *Mulvey,* on the other hand, had emphasized its deterrent effect, "[a]ll of these purposes must be taken into account in understanding the Congressional intent in relation to standing under Section 4."

In *Pfizer* the Court found deterrence to have at least equal importance with compensation as a purpose behind section 4:

"The Court has noted that § 4 has two purposes: to deter violators and deprive them of 'the fruits of their illegality,' and 'to compensate victims of antitrust violations for their injuries.' *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746, 97 S.Ct. 2061, 2075, 52 L.Ed.2d 707; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485–486, 97 S.Ct. 690, 695–96, 50 L.Ed.2d 701; *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982. To deny a foreign plaintiff injured by an antitrust violation the right to sue would defeat these purposes. . . ." 98 S.Ct. at 588.

The Supreme Court placed particular emphasis on the deterrent effect of section 4 stating that "an exclusion of all foreign plaintiffs would lessen the deterrent effect of treble damages." *Id.* [For an underscoring of *Pfizer's* emphasis on the deterrent effect of section 4 see Mr. Chief Justice Burger's dissent. 98 S.Ct. at 596.]

Thus it would seem that the Court has not signaled a narrowing of antitrust standing.

---

tive suit. Thus plaintiffs, in their individual capacities, were "not within the area of the economy affected by defendants' alleged antitrust violations." 565 F.2d at 607. Laughlin's direct right to a percentage of the television rights to the Film, admitted for the purposes of this motion, is clearly distinguishable from these other situations.