AURORA ENTERPRISES, INC. a California corporation, and Xanadu Productions, Inc., a California Corporation, Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY, INC., a corporation, NBC International, Ltd., a corporation, National Telefilm Associates, Inc., a corporation, NTA Delaware, Inc., a corporation, NTA Films, Inc., a corporation, NTA (Canada), Ltd., a corporation, Tele-Communications, Inc., a corporation, TCI Programs, Inc., a corporation, and George C. Hatch, an individual, Defendants.

No. 81–445 AWT.

United States District Court,
C. D. California.

Oct. 20, 1981.

William E. Johnson, Los Angeles, Cal., for plaintiffs.

John J. Hanson, John P. Clark, Gibson, Dunn & Crutcher, Los Angeles, Cal., for National Broadcasting Co., Inc. and NBC Intern., Ltd.

Richard C. Yarmuth, Culp, Dwyer, Cuterson & Grader, Seattle, Wash., Douglas L. Thorpe, Johnsen, Manfredi & Thorpe, Los Angeles, Cal., for Tele-Communications, Inc. and TCI Programs, Inc.

Martin S. Zohn, Pacht, Ross, Warne, Bernhard & Sears, Inc., Los Angeles, Cal., for National Telefilm Assoc., NTA Delaware, NTA Films, Inc., and NTA (Canada) Ltd.

## MEMORANDUM OPINION

TASHIMA, District Judge.

This is an action by the respective producers of the television shows *Bonanza* and

*The High Chaparral* ("*Chaparral*") against National Broadcasting Company ("NBC"), which originally purchased the broadcast rights to the two series, National Telefilm Associates, Inc., and its subsidiaries (collectively "NTA"), which purchased the syndication rights to the two programs in 1973 from NBC, Tele-Communications, Inc. ("TCI"), which controls NTA, and George C. Hatch, a director and shareholder of TCI. The First Amended Complaint ("complaint") alleges four claims under the Sherman Act, 15 U.S.C. §§ 1 & 2, seeking treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and numerous pendent claims under state law. All defendants, except Hatch (whose motion is pending), have moved to dismiss on various grounds. For the reasons stated below, their motions are granted because the complaint does not state a valid federal claim.

The complaint alleges that in 1959, Aurora Enterprises, Inc., began production of the *Bonanza* television series. The series ran successfully on the NBC network for 13 years. In 1966, NBC entered into an agreement with Xanadu Productions, Inc. ("Xanadu"), to develop and produce *Chaparral*. In each instance, NBC was granted an exclusive license for television rights in the programs, including both network exhibition rights and syndication rights.

In 1972, the Federal Communications Commission ("FCC") ordered the three major television networks (CBS, NBC, and ABC) to divest themselves of certain subsidiary network program rights, including syndication rights. NBC subsequently sold all of the syndication rights it then owned to NTA, but it retains as a part of the sales price a share (as do plaintiffs in its programs) of the programs' profits.

### I. *Plaintiffs Lack Standing to Assert a Block-Booking Claim.*

Plaintiffs' first claim is based upon § 1 of the Sherman Act, 15 U.S.C. § 1. It alleges that defendants have conspired to "block-book" *Bonanza* and *Chaparral* with other, unnamed programs that defendants also control. In other words, in order to obtain

a license to show *Bonanza* or *Chaparral*, licensees have allegedly been required to buy exhibition rights for other, less desirable, programs. The complaint also claims that the license fees charged for the tied programs have been artificially inflated, and the fees for the tying programs (*Bonanza* and *Chaparral*) correspondingly diminished, thus, depriving plaintiffs of some of the royalties they should have received.

There is no question that block-booking is a *per se* violation of § 1 of the Sherman Act, if the seller has economic power over the tying product and if a not insubstantial amount of interstate commerce is affected by the tying arrangement. *United States v. Loew's, Inc.*, 371 U.S. 38, 51–52, 83 S.Ct. 97, 105, 9 L.Ed.2d 11 (1962); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). Economic power is presumed when, as is the case here, the tying product is patented or copyrighted, *Loew's, supra*, 371 U.S. at 45, 83 S.Ct. at 102, and, despite its failure to identify specific instances of block-booking, the complaint adequately alleges a substantial effect on commerce. Thus, the elements of a block-booking claim are properly alleged; however, plaintiffs lack the requisite standing to assert such claims.

Plaintiffs rely on *Mulvey v. Samuel Goldwyn Prod.*, 433 F.2d 1073 (9th Cir. 1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). In *Mulvey*, on facts closely analogous to the allegations here, where defendant had admitted block-booking for purposes of its summary judgment motion, the Court, in construing the "by reason of" provision of § 4 of the Clayton Act, 15 U.S.C. § 15, held that plaintiff had standing to sue because he was in the "target area." "He was within the area 'which it could reasonably be foreseen would be affected' by block booking. (*Twentieth Century Fox Film Corp. v. Goldwyn, supra*, 328 F.2d [190] at 220.)" *Id.* 433 F.2d at 1076. Reiterating, the Court stated in conclusion:

> "Goldwyn directed his activities at the means of distributing films in order to

affect their individual revenue-producing potentials—the target area. Mulvey's films are within this target area. Consequently, it is entirely foreseeable that Goldwyn's block booking could impair the profit potential of Mulvey's films, thus depreciating the value of Mulvey's contractual interest in the film's revenue.[4] "

*Id.* (in footnote 4, the Court disagreed with *Fields Prod., Inc. v. United Artists Corp.,* 432 F.2d 1010 (2d Cir. 1970) (*per curiam*), *cert. denied,* 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971)).

*Mulvey,* of course, is controlling authority in this Circuit, unless it has been effectively overruled.

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court, in construing § 4 of the Clayton Act, held that to recover treble damages, plaintiffs "must prove more than injury causally linked" to an unlawful merger. Instead, "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.' " *Id.* (emphasis in original) (citation omitted). The central holding of *Brunswick* has been cited with approval in this Circuit in cases arising under §§ 1 and 2 of the Sherman Act. *E. g., A. H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1307 (9th Cir. 1981).

*Brunswick* makes clear that causation, foreseeability and direct injury (presence in the "target area") are not enough.

"And it is quite clear that if respondents were injured, it was not 'by reason of anything forbidden in the antitrust laws': while respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful."

429 U.S. at 488, 97 S.Ct. at 697. *Mulvey* clearly holds that any direct loss which oc-

curs by reason of an unlawful block-booking constitutes a § 4 antitrust injury, even though such loss does not occur by reason of that which makes block-booking unlawful. For that which makes block-booking unlawful is the injury to competition in the tied product market. The trade which is restrained by tying is the market in which the tied product would otherwise be required to compete by virtue of its own strength. Those who may suffer antitrust injury from *this* restraint of trade are competitors of the tied product and, conceivably, purchasers in the market for the tied and tying products.

The Supreme Court has characterized the antitrust injury which results from tying arrangements thusly:

"They deny competitors free access to the market for the tied product .... At the same time buyers are forced to forego their free choice between competing products."

*Northern Pac. Ry. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Ninth Circuit has similarly characterized the injury to competition from tying arrangements:

"Competitors in the tied product market are injured if they cannot offer their products on an equal basis with the distributor of the tying product. Buyers are injured because they forego choices among products and services, and the public is harmed by the adverse effect on the market for the tied product."

*Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1212 (9th Cir. 1977) (citations and footnote omitted).

I, therefore, conclude that, in light of *Brunswick, Mulvey* is no longer viable precedent and, perforce, not controlling. This judgment, I believe, is confirmed by more recent authority in this Circuit. Thus, in *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 499 (9th Cir. 1977), this Circuit held that:

"It is not enough to confer standing that plaintiff just prove some injury and show that this injury is within the affected area of the economy. Antitrust violations admittedly create many foreseeable

ripples of injury to individuals, but the law has not allowed all of those merely affected by the ripples to sue for treble damages."

See also *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 732 (9th Cir. 1979).[1]

■ Because plaintiffs' claimed injury does not meet *Brunswick's* requirement that it be "of the type the antitrust laws were intended to prevent" and because it does not reflect "the *anticompetitive effect* either of the violation or of anticompetitive acts made possible by the violation," 429 U.S. at 489, 97 S.Ct. at 697 (emphasis added), plaintiffs, as owners of profit rights in allegedly tying programs, lack standing to assert antitrust claims for block-booking. This conclusion is supported by cases in other circuits. *See A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir. 1980); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *cf. In re Beef Indus. Antitrust Litigation*, 600 F.2d 1148, 1168 (5th Cir. 1979), *cert. denied sub nom. Safeway Stores Inc. v. Meat Price Investigators Ass'n*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980) (cattle farmers and ranchers lacked standing to allege retail price fixing by grocers, resulting in reduced consumer demand for beef).[2]

## II. Plaintiff Xanadu's Second Claim is Barred by the Statute of Limitations.

The second claim alleges that as a condition to purchasing the network exhibition rights to *Chaparral* in 1966, NBC insisted on also purchasing the syndication rights to that program. The complaint further alleges that all three networks repeatedly coerced independent television producers in a similar manner, at least until 1972, when the FCC forbade the networks from acquiring syndication rights. 47 C.F.R. § 73.-658(j)(ii). Plaintiff asserts that the contract, the terms of which are still being enforced, is an unreasonable restraint of trade in violation of § 1 of the Sherman Act.[3]

■ NBC asserts that this claim is barred by the four-year statute of limitations applicable to antitrust claims. 15 U.S.C. § 15b.[4] Plaintiff Xanadu's claim is based upon the sale of its rights to NBC in 1966, well outside the limitations period. Even if that purchase were part of a continuing illegal course of conduct by NBC and the other networks, such conduct must have terminated no later than 1973, when the networks were prohibited from any further acquisition of syndication rights. Plaintiff asserts, however, that the statute of limitations has been tolled for a number of reasons.

First, plaintiff argues that the limitation period was tolled during the pendency of *United States v. National Broadcasting Co.*, a civil antitrust action filed in this district against NBC in 1972. That case, and two similar complaints simultaneously filed against each of the other networks, were dismissed without prejudice on November 13, 1974. *United States v. NBC*, 65 F.R.D.

---

1. I recognize that another judge of this district has concluded that *Mulvey's* vitality has not been vitiated by *Brunswick* and is still controlling. *Laughlin v. Wells*, 446 F.Supp. 48 (C.D. Cal.1978).

2. The *Beef Indus.* holding is particularly instructive, because both the Fifth and Ninth Circuits apply the same "target area" approach to determine standing in antitrust cases. *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 497 F.Supp. 218 (C.D.Cal.1980).

3. No conspiracy is alleged in this claim, other than the incorporation by reference of the alleged block-booking conspiracy. The only contract alleged is the one between NBC and Xanadu. The second claim, therefore, fails to state a claim under § 1 of the Sherman Act because it does not allege an operative contract, combination or conspiracy.

4. The bar of the statute, if it is clearly evident on the face of the complaint, may properly be raised on a motion to dismiss. *Steiner v. 20th Century Fox Film Corp.*, 232 F.2d 190, 197 (9th Cir. 1956).

415 (C.D.Cal.1974), *appeal dismissed*, 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975). Separate actions against each of the networks were refiled within a month. The action against NBC was settled by a consent decree in January 1978; however, judgments against CBS and ABC were not rendered until 1980.

 The statute of limitations for antitrust claims is tolled during the pendency of any civil or criminal antitrust case instituted by the United States, and for one year thereafter, as long as the respective causes of action are at least substantially similar. 15 U.S.C. § 16(i); *Leh v. General Petroleum Corp.*, 382 U.S. 54, 59, 86 S.Ct. 203, 207, 15 L.Ed.2d 134 (1965). This action was commenced on January 28, 1981. Therefore, even if it is assumed that the allegations of this case are substantially similar to the allegations in the earlier government case against NBC, the statute would have run since the government's case against NBC was concluded more than one year before the filing of this action.

 Plaintiff argues, however, that for the purposes of the tolling period of § 16(i), the action against NBC should not be deemed to have concluded until 1980, when judgments were rendered in the parallel cases against ABC and CBS. It points to the rule of this Circuit that under § 16(i) a proceeding remains pending until a judgment has been rendered against all co-conspirators, including not only defendants in the immediate proceeding but also all defendants in any other related government actions arising out of the same conspiracy. *Marine Firemen's Union v. Owens-Corning Fiberglass Corp.*, 503 F.2d 246, 249 (9th Cir. 1974); *Maricopa County v. American Pipe & Constr. Co.*, 303 F.Supp. 77 (D.Ariz.1969), *aff'd* 431 F.2d 1145 (9th Cir. 1970), *cert. denied*, 401 U.S. 937, 91 S.Ct. 923, 28 L.Ed.2d 216 (1971); *Utah v. American Pipe and Constr. Co.*, 50 F.R.D. 90, 104 (C.D.Cal.

1970). However, that rule is inapplicable here. The government filed separate actions against each network, and, unlike *Maricopa County, supra*, no conspiracy between the networks was alleged in any of those complaints.

 Plaintiff next alleges that defendants fraudulently concealed the facts surrounding its (Xanadu's) claim by inaccurately reporting the revenue earned through the syndication of *Bonanza* and *Chaparral*. A properly pleaded fraudulent concealment claim must allege affirmative conduct which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief. *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978). The alleged coercion must have been evident to plaintiff in 1966, when the *Chaparral* contract was signed. The allegations do not adequately explain why or how inaccurate profit statements would conceal its claim and plaintiff has come forward with no plausible theory how this could be done.

Next, plaintiff Xanadu argues that its second claim states a continuing claim, since the contract for the purchase of rights to *Chaparral* is still being enforced and is continuing to cause injury to it. This theory is based upon *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975). *Twin City* involved a 1950 contract between a concession service and the then Philadelphia Athletics, granting the service an exclusive franchise. The franchise was extended in 1952, and again in 1954. When the Athletics moved to Oakland, Finley breached the contract and asserted in his defense that the contract violated the antitrust laws. The court held that Finley's counterclaim was not barred by the statute of limitations, because of the continuing nature of the alleged harm (counter-defendant's continued enforcement of the contract in question).[5]

---

**5.** The holding in *Twin City* was, in turn, based on a footnote in *Hanover Shoe Inc. v. United Shoe Mach.*, 392 U.S. 481, 502 n.15, 88 S.Ct. 2224, 2236 n.15, 20 L.Ed.2d 1231 (1968), which stated that defendant's action in collecting rent on a lease that violated the antitrust law constituted a continuing antitrust violation, even though the lease had been executed outside the limitation period. *See also Imperial Point Collonnades Condominium, Inc. v. Mangurian*, 549

The *Twin City* rule, however, was limited in *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir.), *cert. denied sub nom. AMF, Inc. v. General Motors Corp.*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) ("*AMF*"). The plaintiff in that case, AMF, Inc., alleged that the four major American automobile manufacturers had jointly agreed not to buy its "Smog Burner" device. The court found that the actions complained of had taken place in 1964, and that AMF had been completely excluded from the market prior to January 1975. The court held that AMF's injury was final, and that the statute of limitations began to run as of the earlier date.

> " 'Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.' "

591 F.2d at 72 (quoting *Poster Exchange, Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 126–27 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)).

The holding in *AMF* rather than the holding in *Twin City*, controls this case. The injury incurred by plaintiffs, if any, was permanent at the time of sale. Assuming it is true, as plaintiffs assert, that the 1966 contract is still in force, and that NBC continues to collect a larger share of the profits than it would have received had it not allegedly coerced plaintiffs into selling the syndication rights along with the network exhibition rights; nevertheless, unlike *Twin City* and *Hanover Shoe*, the contract in question does not *itself* violate the antitrust laws. What is alleged to have violated the antitrust laws is NBC's exercise of coercion in 1966, and that act was "by its nature permanent at initiation without further acts". *AMF, supra*, 591 F.2d at 72.

Finally, plaintiffs argue that their claims could not have accrued until the damages suffered thereby became provable and ascertainable, and that their damages have become ascertainable only recently, in light of the defendants' fraudulent and inaccurate accounting. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1361 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). In *AMF, supra*, 591 F.2d at 72–73, the same argument was raised and the Ninth Circuit there recognized the difference between uncertainty of the fact of damage, which prevents recovery, and uncertainty of the extent of damage, which does not prevent recovery. The coercion complained of in the second claim constituted certain damage at the time it occurred, in 1966; only the extent of damage may have remained uncertain. If suit had been brought by plaintiffs at the proper time, they would have had a claim in spite of the fact that *Chaparral's* future profitability may not have been known with certainty. An antitrust plaintiff is not required to prove damages with exactitude. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969). Since plaintiff Xanadu has failed to offer a valid reason for tolling the statute of limitations, its second claim must also be dismissed.

### III. Plaintiffs' Third Claim Also Fails to State A Claim.

Plaintiffs' third claim alleges that NBC agreed to syndicate all, or almost all, of its programs through NTA and that NTA, in turn, agreed to syndicate those programs, including *Bonanza* and *Chaparral*, in such a way as to minimize competition with programming on the NBC network. This claim must be dismissed as well because, as presently framed, it does not state a claim upon which relief can be granted.

F.2d 1029 (5th Cir.), *cert. denied sub nom. Mangurian v. Thompson*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977); *Baker v. F & F Inv.*, 420

F.2d 1191 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970).

First, it is not clear whether this claim arises solely from NBC's sale of syndication rights to NTA in 1973 or whether plaintiffs are alleging a continuing agreement between defendants. If plaintiffs intend to challenge only the direct effects of the sale, this claim is barred by the statute of limitations, since it arose at the time of the sale and since plaintiffs were aware of the sale at the time it was consummated. See Part II, *ante.*

Second, if plaintiffs intend to allege a continuing conspiracy between NBC and NTA to divide the television programming market, their allegations are insufficient without a more complete statement of the actions defendants have taken to carry out their scheme. Since NTA does not itself exhibit plaintiffs' programs, the complaint as currently framed does not adequately state how the alleged conspiracy or agreement could have inflicted an antitrust injury on plaintiffs.[6]

Although plaintiffs have already once amended their complaint, they will be given one final opportunity to further amend this claim. Plaintiffs should set forth with specificity the nature and objective of the alleged conspiracy, its members and how the unreasonable restraint of trade alleged was sought to be accomplished. Accordingly, the third claim will be dismissed with leave to amend.

### IV. *The Attempted Monopolization Claim Must Also Be Dismissed.*

 Plaintiffs' final federal claim is that defendants' conduct, as alleged in the first three claims, "was done with the specific intent of obtaining a monopoly in television production, distribution, and programming in general and on the NBC Television Network," and constitutes an attempt to monopolize such markets. To adequately allege an attempt to monopolize claim under § 2 of the Sherman Act, 15 U.S.C. § 2, three elements are indispens-

able: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to the accomplishment of that unlawful purpose; and (3) a dangerous probability of success. *E. g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 652 F.2d 917, 931 (9th Cir. 1981); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 669 (9th Cir. 1980). Plaintiffs' § 2 claim alleges no independent facts, relying instead on those asserted in the three § 1 claims. The dismissal of those claims requires that the § 2 claim be dismissed as well for failure to adequately allege predatory conduct. *See William Inglis & Sons Baking Co., supra,* 652 F.2d at 934 n.14. In addition, there is no allegation of the third element, dangerous probability of success. Plaintiffs' fourth claim, therefore, is dismissed for failure to state a claim on which relief can be granted.

### V. *The Pendent State Claims Should Also be Dismissed.*

 The complaint includes nine separate state law claims for violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), unfair competition, breach of contract, fraud, accounting, breach of fiduciary duty, money had and received, conversion and to impose a constructive trust. These claims are ordered dismissed, in the exercise of the Court's discretion, without prejudice and without leave to amend.

In *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), while the holding that federal courts have the power to hear state claims which share a common nucleus of operative facts with substantial federal claims, the Court stated:

> "That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that

---

**6.** Plaintiffs' standing to pursue this claim also appears to be highly doubtful. Since plaintiffs seem to be claiming that their own syndicator, NTA, was one of the conspirators in the attempted monopolization scheme, plaintiffs would appear to be the beneficiaries and not the victims of the attempt, *i. e.,* the injury, if any, suffered by plaintiffs from NTA's attempt to monopolize was not an antitrust injury. See Part I, *ante.*

**664**

pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims .... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law .... [I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals."

The issues raised and proof required by plaintiffs' state law claims substantially outweigh and diverge from the issues presented by their federal antitrust claims as to which leave to amend has been granted. These claims, therefore, are more properly left for determination by the state courts.

*Conclusion*

The antitrust laws embody an important federal policy, but their scope is not unlimited. Because plaintiffs have not suggested how their first and second claims could be amended and, in view of the allegations heretofore made, it appearing that they cannot do so, the first and second claims are dismissed without leave to further amend. However, leave will be granted to amend the third and fourth claims. While plaintiffs may well have viable state law claims, these claims should properly be resolved by state courts. Therefore, this Court declines to exercise its pendent jurisdiction over these claims and they are dismissed without prejudice.