688 F.2d 689
 1982-2 Trade Cases 64,956, 1983 Copr.L.Dec. P 25,516
 AURORA ENTERPRISES, INC., a California corporation, and
Xanadu Productions, Inc., a California
corporation, Plaintiffs-Appellants,
v.
NATIONAL BROADCASTING COMPANY, INC., a corporation; NBC
International, Ltd., a corporation; National Telefilm
Associates, Inc., a corporation; NTA Delaware, Inc., a
corporation; NTA Films, Inc., a corporation; NTA (Canada),
Ltd., a corporation; Tele-Communications, Inc., a
corporation; TCI Programs, Inc., a corporation; and George
C. Hatch, an individual, Defendants-Appellees.
 Nos. 81-5948, 82-5001.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1982.
Decided Sept. 23, 1982.
 
 William E. Johnson, Los Angeles, Cal., for plaintiffs-appellants.
 John J. Hanson, Los Angeles, Cal., Dennis McCarthy, Salt Lake City, Utah, argued, for defendants-appellees; Gibson, Dunn & Crutcher, Los Angeles, Cal., Richard C. Yarmuth, Seattle, Wash., Henry C. Thumann, and Gregory R. Oxford, O'Melveny & Myers, Los Angeles, Cal., Vancott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, on brief.
 Appeal from the United States District Court for the Central District of California.
 Before ANDERSON, FERGUSON and REINHARDT, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 Plaintiffs Aurora Enterprises, Inc. ("Aurora") and Xanadu Productions, Inc. ("Xanadu") are commonly-controlled television production companies. Aurora and Xanadu played a role in developing, respectively, the television series Bonanza and The High Chaparral ("Chaparral").
 
 
 2
 Defendants are involved in the network exhibition, distribution, and syndication of television programs. Defendant NBC purchased from Aurora and Xanadu, respectively, the rights to broadcast Bonanza and Chaparral. The broadcast right allows NBC to distribute programs to NBC affiliates, a form of distribution called "networking." "Syndication" refers to another form of distribution, whereby the program producer grants a license to exhibit the program on individual television stations. Bonanza was exhibited on the NBC Television Network from 1959 through 1973, and Chaparral was exhibited from 1968 through 1971.
 
 
 3
 In 1972, the Federal Communications Commission ordered the three major networks to divest themselves of their syndication business. See 47 C.F.R. § 73.658(j) (1981). As a result, NBC sold all syndication rights it then owned to National Telefilm Associates, Inc. ("NTA"). NBC retains as a part of the sales price a share (as do plaintiffs in their programs) of the programs' profits.
 
 
 4
 Defendant NTA's parent entity is Tele-Communications, Inc. ("TCI"). Defendant George Hatch is NTA's president and chairman of the board.
 
 
 5
 Plaintiffs sued defendants for four federal antitrust violations and for various state claims. Count I (block booking) and Count II (tying of network exhibition and syndication rights) were dismissed without leave to amend. Counts III and IV were dismissed with leave to amend. Counts V through XIII, state claims, were dismissed without prejudice. Aurora Enterprises v. National Broadcasting Co., 524 F.Supp. 655 (C.D. Cal. 1981). Plaintiffs did not amend Counts III and IV, and these too were finally dismissed.
 
 
 6
 The district court also ordered that the federal antitrust claims, Counts I through IV, be dismissed as to George Hatch, for lack of personal jurisdiction and for improper venue. The state law claims were dismissed against Hatch without prejudice and without leave to amend.
 
 
 7
 Plaintiffs appeal the dismissal of their federal and state claims and the dismissal of Hatch for lack of personal jurisdiction and improper venue.
 
 
 8
 I. THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS LACK STANDING TO SUE FOR BLOCK BOOKING.
 
 
 9
 Whether plaintiffs have standing to sue for block booking depends upon a proper construction of the "by reason of" provision of § 4 of the Clayton Act. Section 4 provides in pertinent part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained...." (emphasis added). That language was construed in Mulvey v. Samuel Goldwyn Prod., 433 F.2d 1073 (9th Cir. 1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). That case continues to be cited by this circuit as authority on standing to sue for antitrust violations. California State Council v. Associated General, 648 F.2d 527, 537 & 537 n. 15 (9th Cir. 1980); Blankenship v. Hearst Corp., 519 F.2d 418, 426 (9th Cir. 1975); De Voto v. Pacific Fidelity Life Insurance Co., 516 F.2d 1, 3 & 3 n. 5 (9th Cir. 1975). The district court recognized that Mulvey is controlling authority, unless it has been overruled by Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).
 
 
 10
 In Mulvey, supra, the owner of a motion picture sold his entire interest to Samuel Goldwyn Productions in return for a down payment and a share of the receipts. The owner charged that his receipts were diminished by a block-booking scheme. The court held that plaintiff had standing to sue because he was within the "target area":
 
 
 11
 Goldwyn directed his activities at the means of distributing films in order to affect their individual revenue-producing potentials-the target area. Mulvey's films are within this target area. Consequently, it is entirely foreseeable that Goldwyn's block booking could impair the profit potential of Mulvey's films, thus depreciating the value of Mulvey's contractual interest in the films' revenue.
 
 
 12
 433 F.2d at 1076.
 
 
 13
 The district court held that Mulvey had been effectively overruled by Brunswick, supra. In Brunswick, the major producer of bowling alleys repossessed numerous bowling alleys during a slump in bowling business; as a result, Brunswick Corporation was put in the position of both operating and producing bowling alleys. The Supreme Court refused to confer standing on plaintiffs, bowling alley operators, who sued Brunswick Corporation for antitrust violations. The Court held that plaintiffs failed to prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." Brunswick, supra, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).
 
 
 14
 The district court interpreted Brunswick's holding to mean that plaintiffs in the instant case lacked antitrust injury and therefore lacked standing to sue: "Those who may suffer antitrust injury from this restraint of trade (tying) are competitors of the tied product and, conceivably, purchasers in the market for the tied and tying products." 524 F.Supp. at 659. Plaintiffs, as producers of the tying product, were held to lack standing to pursue an antitrust claim.
 
 
 15
 The narrow view that standing exists only for competitors of the product that is marketed has been rejected in Blue Shield of Virginia v. McCready, --- U.S. ----, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (conferring standing on a patient-consumer of medical services); and Ostrofe v. H.S. Crocker Co., Inc., 670 F.2d 1378 (9th Cir. 1982) (conferring standing on an employee who was fired for refusing to participate in employer's price fixing scheme).
 
 
 16
 McCready, supra, explains why plaintiffs suffered no antitrust injury in Brunswick: "(R)espondents (in Brunswick ) sought in damages 'the profits they would have realized had competition been reduced.' 429 U.S. at 488, 97 S.Ct. at 697 (emphasis added)." McCready, supra, --- U.S. at ----, 102 S.Ct. at 2550. Competition was increased by defendants' actions in Brunswick; therefore, plaintiffs suffered no antitrust injury. In contrast, the alleged tying arrangement in the present case is a per se violation of the antitrust laws.
 
 
 17
 We hold that plaintiffs have standing to sue for antitrust violations under Mulvey, supra, which has never been overruled and remains the law of this circuit.
 
 
 18
 II. PLAINTIFF XANADU'S CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS AND LACHES.
 
 
 19
 The second claim alleges that as a condition to purchasing Xanadu's network exhibition rights to Chaparral in 1966, NBC also insisted on purchasing Xanadu's syndication rights to Chaparral. Xanadu alleges that the tying of network exhibition rights to syndication rights unreasonably restrains trade. Xanadu claims that it has been damaged by enforcement of the "tying agreement" by being deprived of revenues that it would have earned had it not been forced to part with syndication rights.
 
 
 20
 The district court dismissed this claim on the ground, inter alia, that the claim was barred by the four-year statute of limitations, 15 U.S.C. § 15(b), which applies to actions brought under the Sherman Act. Xanadu's claim arises from a sale of syndication rights that occurred more than four years before it brought its complaint. Thus, unless Xanadu can invoke an exception to the statute of limitations, its claim must be barred. The district court considered and rejected the applicability of four exceptions, which we now review: (1) tolling, (2) fraudulently concealed facts concerning the claims, (3) continuous antitrust violations, and (4) speculative damages.
 
 
 21
 First, we agree with the district court that the statute has not been tolled until the date of this complaint by the pendency of United States v. National Broadcasting Co., Inc., 449 F.Supp. 1127, 1130 (C.D. Cal. 1978), a civil antitrust action. That action, settled more than a year before the commencement of the present suit, has ceased to toll the statute. 15 U.S.C. § 16(i). Nor does the pendency of separate and distinct actions that the government filed against other networks that were never alleged to be a part of a conspiracy toll the statute in the instant case.
 
 
 22
 Second, the fraudulent concealment alleged in this case does not give rise to an exception to the statute. In 1966, plaintiff Xanadu knew that it was giving up its syndication rights when it signed a contract with defendant NBC. That loss of syndication rights, the gravamen of plaintiff Xanadu's claim, was not concealed from Xanadu. Although plaintiff alleges that defendant subsequently gave plaintiff a fraudulent accounting of profits, there is no explanation of how that circumstance could have led a reasonable person to believe that he did not have a claim for relief in 1966.
 
 
 23
 Third, Xanadu alleges that it "has been damaged by the enforcement of this tying agreement." In an effort to liberally construe Xanadu's pleadings, see Fed. R. Civ. Proc. 8(f), we will assume that Xanadu's contention is that NBC continues to receive benefits from the 1966 contract and consider whether such receipt constitutes an overt act sufficient to restart the statute of limitations.
 
 
 24
 In deciding that the statute of limitations had run, the district court relied on In re Multidistrict Vehicle Air Pollution, 591 F.2d 68 (9th Cir.), cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) ("AMF"). In that case, plaintiff alleged that four major automobile manufacturers conspired not to buy its pollution control device. The court held that plaintiff's injury was final as of the date of the refusal to deal. The AMF case is not on point, however, because it involves an allegation of a refusal to deal, not an allegation of enforcement of an illegal contract.
 
 
 25
 Active enforcement of an illegal contract may, under certain circumstances, cause renewal of an injury and restart the statute of limitations. Twin City Sportservices, Inc. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975). In that case, a monopolization claim was held not to be barred by the statute of limitations because of defendant's recent attempts to monopolize, including its actual continued enforcement of an exclusive concession contract in the very act of bringing a lawsuit for breach of contract in which plaintiff's antitrust counterclaim was raised.
 
 
 26
 But not every act by an antitrust defendant is sufficient to restart the statute of limitations. We must therefore look more closely at defendants' "acts" to determine whether they renew the antitrust injury. Since 1966, NBC has been entitled to receive syndication profits as a result of its contract with Xanadu. In 1973, defendant NTA purchased the assets of NBC's syndication subsidiaries and took over syndication of NBC's programs. NBC now receives syndication profits, if there are any, from NTA. Defendant NTA is entitled to a share of syndication profits under its contract with NBC. However, the mere fact that defendants receive a benefit today as a result of a contract executed in 1966 in which Xanadu was purportedly coerced to part with syndication rights, is not enough to restart the statute of limitations. Any other holding would destroy the function of the statute, since parties may continue indefinitely to receive some benefit as a result of an illegal act performed in the distant past.
 
 
 27
 Although a continuing benefit theory was advanced in Imperial Point Colonnades Condominium, Inc. v. Mangurian, 549 F.2d 1029 (5th Cir.), cert. denied, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), that case has been limited by City of El Paso v. Darbyshire Steel Co., Inc., 575 F.2d 521 (5th Cir. 1978), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). As the court noted in Electrogas, Inc. v. Dynatex Corp., 497 F.Supp. 97, 105 (N.D. Cal. 1980), "Mangurian was distinguished as a case involving damages that were not ascertainable at the time the contracts were executed."
 
 
 28
 Fourth, we also agree with the district court that the speculative damages exception to the statute set forth in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), is not available to plaintiff Xanadu. The harm complained of in the second count constituted certain damages more than four years prior to the time in 1981 when the complaint was filed. Mere uncertainty as to the extent or amount of damage will not bar recovery under the antitrust laws. Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).
 
 
 29
 Finally, plaintiff Xanadu urges that the district court's dismissal should be reversed because the court's opinion referred only to the statute of limitations and did not expressly indicate that it was also using Xanadu's delay (from 1966 to 1981) in bringing suit as the applicable laches period for any equitable relief sought. The four-year statute of limitations period in the Clayton Act furnishes a guideline for computation of the laches period in antitrust suits. International Tel. & Tel. Corp. v. General Tel. & Elec. Corp., 518 F.2d 913, 926 (9th Cir. 1975). If the district court had explicitly applied that guideline, it would have correctly dismissed a request for injunctive relief on the ground of laches.
 
 
 30
 III. THE COURT DID NOT ERR BY DISMISSING PLAINTIFF'S THIRD CLAIM.
 
 
 31
 The district court fairly characterized plaintiff's third claim as follows:Plaintiff's third claim alleges that NBC agreed to syndicate all, or almost all, of its programs through NTA and that NTA, in turn, agreed to syndicate those programs, including Bonanza and Chaparral, in such a way as to minimize competition with programming on the NBC network.
 
 
 32
 524 F.Supp. at 662.
 
 
 33
 In 1973, NBC sold its syndication rights to NTA, pursuant to the directive of the FCC that networks divest themselves of syndication rights. The district court noted that the complaint was ambiguous as to whether plaintiffs had been harmed solely by effects of the sale in 1973 or by a continuing conspiracy; in the former case, plaintiffs' claim was barred by the statute of limitations.
 
 
 34
 The district court further held that, in the event that plaintiffs were alleging a continuing conspiracy, "the complaint, as currently framed does not adequately state how the alleged conspiracy or agreement could have inflicted an antitrust injury." 524 F.Supp. at 663 (footnote omitted).
 
 
 35
 We agree. We presume that plaintiffs have some continuing profit sharing interest in network and/or syndication rights, or they would have no interest whatsoever in the amount of revenue generated by network or syndication rights. It is not clear, however, how or why efforts to restrain competition with NTA's syndication rights or NBC's network rights injured plaintiffs. Nor does the complaint enlighten, for it pleads in conclusory fashion that there was an unreasonable restraint of trade, without indicating how plaintiffs were injured by the alleged restraint, which, unlike a tying agreement, is not per se illegal.
 
 
 36
 The district court gave plaintiffs one final opportunity to amend this claim "to set forth with specificity the nature and objective of the alleged conspiracy, its members and how the unreasonable restraint of trade alleged was sought to be accomplished." 524 F.Supp. at 663. Plaintiffs did not take this opportunity to clarify their pleading. Accordingly, we uphold the dismissal of this claim.
 
 
 37
 IV. THE ATTEMPTED MONOPOLIZATION CLAIM SHOULD NOT HAVE BEEN DISMISSED BECAUSE PLAINTIFFS PROPERLY STATED AN ANTITRUST CLAIM FOR TYING IN COUNT I.
 
 
 38
 Plaintiffs claim that defendants' conduct, as alleged in the first three claims, "was done with the specific intent of obtaining a monopoly in television production, distribution, and programming in general and on the NBC Television Network." Plaintiffs alleged that this conduct, coupled with intent, constituted an attempt to monopolize a market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. The district court dismissed this count for failing to adequately allege three elements of an attempt claim: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to the accomplishment of that unlawful purpose; and (3) dangerous probability of success.
 
 
 39
 The district court reasoned that the dismissal of the first three claims, all of which had been incorporated into plaintiffs' attempted monopolization claim, resulted in plaintiffs' inability to allege predatory conduct or dangerous probability of success.
 
 
 40
 Predatory conduct includes "conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or exclusionary." William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1030 (9th Cir. 1981). Furthermore, "cases ... have explicitly equated such conduct with an unreasonable restraint of trade in violation of section 1 of the Sherman Act." Id. at 1028. Thus, it is possible to infer predatory conduct from a tying scheme, which is a per se violation of Section 1. Specific intent may also be inferred from such conduct. Id. Dangerous probability of success is inferrable "from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred." Id. at 1029. We note, however, that probability of actual monopolization is not an essential element of proof of attempt to monopolize. Forro Precision, Inc. v. Intern. Business Machines, 673 F.2d 1045, 1059 (9th Cir. 1982).
 
 
 41
 Since the elements of an attempt to monopolize can be inferred from conduct alleged in Count I, plaintiffs' fourth count is properly stated.
 
 
 42
 V. THE DISTRICT COURT MUST RECONSIDER WHETHER STATE CLAIMS SHOULD BE DISMISSED.
 
 
 43
 The district court held: "The issues raised and proof required by plaintiffs' state law claims substantially outweigh and diverge from the issues presented by their federal antitrust claims as to which leave to amend has been granted. These claims, therefore, are more properly left for determination by the state courts." 524 F.Supp. at 664 (emphasis added). The district court did not consider whether the federal claims that were dismissed without leave to amend were related to the state claims. Because Count I, one of those claims that the court dismissed without leave to amend, is remanded for trial, the district court must consider whether the state claims are pendent to the federal claim.
 
 
 44
 VI. THE DISTRICT COURT DID NOT ERR BY DISMISSING DEFENDANT HATCH FOR LACK OF PERSONAL JURISDICTION.
 
 
 45
 Defendant Hatch resides in Utah. He owns no property and has no agent in California. He is a director of NTA, a New York Corporation. An affidavit submitted by plaintiffs states:
 
 
 46
 In Los Angeles in late February and early March 1978, George Hatch was present and approved a block sale of product (sic) from the NTA library, including Bonanza and The High Chaparral (.) ... Hatch was clearly involved in setting the sales policies of NTA.
 
 
 47
 Since the court correctly held that defendant's activities were not so pervasive as to subject him to the court's general jurisdiction, whether personal jurisdiction will lie must turn on an evaluation of the defendant's contacts in relation to the cause of action.
 
 
 48
 The strongest piece of evidence supporting limited personal jurisdiction over Hatch is the affidavit stating that, while in Los Angeles, he "approved" a block sale that included Bonanza and Chaparral. Hatch's ambiguous act of "approval" in California-an act that, for all plaintiff's affidavit indicates, does not even amount to contract negotiations or consummation of a contract-does not constitute an act by which he purposely availed himself of the privilege of conducting activities in the forum, "thereby invoking the benefits and protections of its laws." See Data Disc, Inc. v. Systems Technology Assoc., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977). We uphold the dismissal on the ground of lack of personal jurisdiction.
 
 
 49
 Finally, the district court did not abuse its discretion by denying plaintiffs a third continuance for jurisdictional discovery against Hatch. Before the denial, plaintiffs had had three months to conduct discovery against Hatch, but had not done so.
 
 CONCLUSION
 
 50
 The decision of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.