743 F.2d 1388
 53 USLW 2209, 1984-2 Trade Cases 66,216
 Mario DE MODENA, dba Sixth Avenue Pharmacy, et al.,
Plaintiffs-Appellants,
v.
KAISER FOUNDATION HEALTH PLAN, INC., et al., Defendants-Appellees.
PORTLAND RETAIL DRUGGISTS ASSOCIATION, INC., Plaintiff-Appellant,
v.
KAISER FOUNDATION HEALTH PLAN, INC., et al., Defendants-Appellees.
 Nos. 83-5720, 83-5721.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1983.
Decided Oct. 2, 1984.
 
 Roger Tilbury, Portland, Or., for plaintiffs-appellants.
 Jesse Grove, III, San Francisco, Cal., for defendants-appellees.
 On Appeal from the U.S. District Court for the Central District of California.
 Before BROWNING and NORRIS, Circuit Judges, and KING, District Judge.*
 NORRIS, Circuit Judge:
 
 I. FACTS
 
 1
 Appellants are retail pharmacies located in Oregon and California. Appellees are the related corporations--including regional health plans, regional medical groups, and non-profit hospitals--that make up the Kaiser-Permanente Medical Care Program.
 
 
 2
 Appellees provide health care in a manner substantially different from the traditional fee-for-service method of health care in which a consumer pays a separate charge for each medical service or good provided by the doctor or hospital. The regional Kaiser Health Plans (HP's) contract with consumers who wish to become members and provide them with medical care in return for monthly dues. Each HP provides this care through two related organizations: Kaiser Foundation Hospitals, a California non-profit corporation which operates the Kaiser hospitals, and one of the eight regional Permanente Medical Groups. In addition, the HP's provide interested members with a "drug plan." Under this plan, for an additional monthly charge, members obtain the right to purchase drugs at little or no cost. They can purchase these pharmaceuticals at a Kaiser hospital or at a pharmacy at a non-hospital location operated by an HP.[1]
 
 
 3
 In this antitrust action, appellants advance three discrete claims concerning appellees' provision of drugs to HP members. First, they argue that appellees violated the Robinson-Patman Act, 15 U.S.C. Sec. 13, by buying drugs at discriminatorily low prices from pharmaceutical companies and dispensing these drugs to HP members. Second, appellants maintain that appellees are attempting to monopolize the retail drug market in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2. Third, they contend that appellants violated section 3 of the Clayton Act, 15 U.S.C. Sec. 14, by tying the sale of drugs to the sale of other health services.
 
 
 4
 Appellees moved for summary judgment below, and the district court granted the motion on all three claims.[2] Appellants then brought this timely appeal.
 
 II. THE ROBINSON-PATMAN ACT CLAIM
 
 5
 The district court ruled that appellees were not liable for violating the Robinson-Patman Act--even assuming they bought drugs at discriminatorily low prices--because they fall within an exception to that Act created by the Nonprofit Institutions Act.
 
 
 6
 The Nonprofit Institutions Act provides, "Nothing in the [Robinson-Patman Act] shall apply to purchases of supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit." 15 U.S.C. Sec. 13c. Appellees can thus qualify for this exception if they are 1) non-profit institutions; 2) eligible institutions under the Act; and 3) made the purchases in question for their "own use."
 
 
 7
 * The HP's and Kaiser Hospitals are organized as non-profit institutions and would thus appear to meet the first of the Act's requirements. Appellants argue, however, that these institutions are not really non-profit because they are controlled by Permanente Medical Groups, which are for-profit corporations consisting of doctors who provide medical care for members.[3]
 
 
 8
 We disagree. Both the Internal Revenue Service and the district court found that the Medical Groups do not exert control over the HP's, and given the financial arrangements between the Medical Groups and the HP's, we believe that this conclusion is persuasive. The Medical Groups do not set their own fees. The HP's pay the Medical Groups an agreed upon amount per member per month, and this amount does not vary with the volume of service the group provides to the membership.[4] This fact greatly limits the amount of control the Medical Groups can exercise over the HP's. That the HP's and Kaiser Hospitals must fulfill their need for certain medical services by contracting with doctors who seek a profit does not make the HP's and Kaiser Hospitals themselves for-profit organizations.
 
 B
 
 9
 We next consider whether the HP's and Kaiser Hospitals are eligible institutions under the Nonprofit Institutions Act. With respect to Kaiser Hospitals this question is easily answered. The Act explicitly lists hospitals as eligible organizations. In the case of the HP's, however, the answer is not as simple. The Act does not explicitly list HP's. Thus, we must determine whether such organizations are charitable institutions within the meaning of the Act.
 
 
 10
 There is no case law concerning which institutions are considered charitable for purposes of the Nonprofit Institutions Act. There is, however, a substantial body of precedent defining the term charitable for purposes of the tax code and the law of charitable trusts. Because the drafters of the Nonprofit Institutions Act wished to protect the same eleemosynary institutions that are given special consideration under the tax and charitable trusts laws, see S.Rep. No. 1769, 75th Cong. 3rd Sess. 1 (1938); H.R.Rep. No. 2161, 75th Cong., 3rd Sess. 1 (1938), we believe it is appropriate to refer to these precedents here. Thus, we look to this body of case law for guidance in determining whether the HP's are charitable institutions within the meaning of the Nonprofit Institutions Act.
 
 
 11
 "The definition of the term 'charitable' has never been static and has been broadened in recent years." Eastern Kentucky Welfare Rights Org. v. Simon, 506 F.2d 1278, 1286 (D.C.Cir.1974), modified on other grounds, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), cited with approval, Abbott Laboratories v. Portland Retail Druggists Assn., 425 U.S. 1, 11, 96 S.Ct. 1305, 1313, 47 L.Ed.2d 537 (1976) (concept of the non-profit hospital has expanded over the years). In earlier times, health organizations were recognized as charitable only if they were supported primarily by donations and used those donations to provide health care for the indigent. Id. With the emergence of social welfare, insurance, and municipal hospitals, however, the number of poor requiring free or below cost medical services was drastically reduced. This reduction eliminated the rationale upon which the traditional, limited definition of charitable was predicated, resulting in a move towards a less restrictive interpretation of the term in recent years. Id. at 1288-89. Now all non-profit organizations which promote health are considered charitable under the law of charitable trusts. Restatement (Second) of Trusts Sec. 368, at 246 (1959); G. Bogert & G. Bogert, Law of Trusts Sec. 62 (1973). Further, a number of courts have specifically held that health maintenance organizations, such as the HP's, are charitable institutions for tax purposes. Sound Health Ass'n v. Commissioner, 71 T.C. 158, 177-81 (1978). Indeed, both the HP's and Kaiser Hospitals are exempt from income taxes as charitable institutions. Given this increasingly liberal interpretation of the term, we conclude that the HP's are charitable institutions within the meaning of the Nonprofit Institutions Act.
 
 C
 
 12
 Finally, we must determine whether the purchases here in question were made for the HP's and Kaiser Hospitals' "own use."[5] Appellants contend that the HP's and Kaiser Hospitals purchased drugs not for their own use, but for the use of others, namely their members. Appellees contend, by contrast, that what they purchase for the use of their members is purchased for their "own use" within the meaning of the Act.
 
 
 13
 The "own use" issue is conceptually the most challenging aspect of this case because there is so little law in this area; the only relevant case is Abbott Laboratories v. Portland Retail Druggists Ass'n, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976). In Abbott Labs, the Court addressed the question whether sales of drugs purchased at discriminatorily low prices by non-profit, fee-for-service hospitals--hospitals which were not part of a health maintenance organization such as Kaiser--were exempt under the Nonprofit Institutions Act.
 
 
 14
 In resolving this question, the Court was torn between two competing concerns. On the one hand, the Court was interpreting an explicit exemption from the Robinson-Patman Act that reflected Congress' desire to aid non-profit institutions even when those institutions fulfilled needs beyond those traditionally fulfilled by charities. Id. at 13, 96 S.Ct. at 1314. On the other hand, the Court reiterated the maxim that exceptions to the Robinson-Patman Act are to be construed narrowly and emphasized that this exemption in particular was not "to be applied and expanded automatically to whatever new venture the nonprofit hospital finds attractive in these changing days." Id.
 
 
 15
 The Court resolved this tension by formulating a test which it found "inherent in the language of the statute." Id. at 14, 96 S.Ct. at 1314. Under this test, " 'their own use' is what reasonably may be regarded as use by the hospital in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients." Id. (emphasis in the original).
 
 
 16
 The Court applied this test to ten separate categories of drug sales. The Court exempted sales of drugs to in-patients, emergency room patients, and out-patients for use on hospital premises. The Court also exempted sales to both in-patients and out-patients for take home use, sales to hospital employees and students for their personal use or use by their dependents, and sales to the hospital's medical staff for their personal use or use by their dependents. The Court declined to exempt sales on prescription refills, sales to the hospital's medical staff for resale in private practice, and sales to walk-in customers who were not being treated at the hospital.[6]
 
 
 17
 Appellants ask us to adopt the categorical rules set forth in Abbott Labs wholesale and apply them to this case. This suggestion, however, ignores the manner in which these rules were originally derived and would, if adopted, violate the spirit, if not the letter, of the Supreme Court's decision. In Abbott Labs, the Court generated its categorical rules by first determining the basic institutional function of a non-profit, fee-for-service hospital and then deciding which sales fit within this institutional function and which did not. Thus, to follow the true mandate of Abbott Labs we should not simply adopt the categorical rules set forth in that decision, but should instead determine the basic institutional function of the Kaiser-Permanente Medical Care Program and then decide which sales are in keeping with this function.
 
 
 18
 Health maintenance organizations (HMO's), such as Kaiser-Permanente, are designed to provide a complete panoply of health care to their members. See S.Rep. No. 129, 93rd Cong., 1st Sess., reprinted in 1973 U.S.Code Cong. & Ad.News 3033, 3040. See generally II Report of the National Advisory Commission on Health Manpower (1967). Whereas fee-for-service hospitals provide health care on a temporary and usually remedial basis to their patients, HMO's provide continuing and often preventive health care for their members. See 42 U.S.C. Sec. 300e(b)(1)-(2) (describing a HMO's continuing obligations to its members). Given this extraordinary broad institutional function, any sale of drugs by an HMO to one of its members falls within the basic function of the HMO. Consequently, we must conclude that drugs purchased by an HMO, such as Kaiser-Permanente, for resale to its members are purchased for the HMO's "own use" within the meaning of the Nonprofit Institutions Act and thus qualify for protection under the Act.[7]
 
 
 19
 We believe that this result is in keeping with the intent of the 75th Congress which drafted the Nonprofit Institutions Act. Although the exact intent of Congress is less than crystal clear from a reading of the legislative history, see Rosoff & Dunfee, A "Fix" for the Retail Pharmacy: The Supreme Court Redefines Application of the Robinson-Patman Act to Drug Sales by Nonprofit Hospitals, 13 Cal.W.L.Rev. 195, 203 n. 35 (1977), at least one Justice has concluded that the Act was passed because "Congress was primarily interested in directly aiding nonprofit institutions by lowering their operating expenses, but not interested in indirectly aiding such institutions by providing them with the means of raising additional money." Abbott Labs, 425 U.S. at 23, 96 S.Ct. at 1318 (Marshall, J., concurring). If that principle is applied to this case, it supports a finding that all drugs purchased by an HMO for resale to its members fall within the Nonprofit Institutions Act. There can be no question that allowing HMO's to purchase drugs that are resold to members at lower prices directly helps the HMO by lowering the operating expense it must incur to provide this aspect of health care to its membership.
 
 
 20
 We also believe that a finding that drugs purchased by an HMO for resale to its members qualify for protection under the Nonprofit Institutions Act is in keeping with national health care policy. Under Abbott Labs, fee-for-service hospitals are exempted from the Robinson-Patman Act when they provide medicine to their patients. If we held that HMO's, such as Kaiser-Permanente, do not qualify for a similar exemption when they provide medicine for their members, fee-for-service hospitals would enjoy a market advantage over HMO's. Congress passed the Health Maintenance Organization Act in 1976, however, to ensure that consumers have a free choice among various methods of obtaining medical care because Congress believed that this was the best way to lower the medical costs that consumers must bear. S.Rep. No. 129, 93rd Cong., 1st Sess., reprinted in 1973 U.S.Code Cong. & Ad.News 3033, 3039-40. Accordingly, we decline to interpret the somewhat open-ended language of the Nonprofit Institutions Act in a way which would impinge upon the free choice of consumers of medical goods and services.
 
 
 21
 Our conclusion that drugs purchased by HMO's for resale to members are purchased for the HMO's "own use" and thus qualify for protection under the Nonprofit Institutions Act does not dispose of appellants' Robinson-Patman Act claim, however. Appellees make some sales to walk-in customers who are not members of a Kaiser-Permanente HP. Under our analysis, those sales are not protected by the Nonprofit Institutions Act. Indeed, appellees concede that these sales are not for the HP's "own use" and thus are not covered by the Nonprofit Institutions Act. Nevertheless, appellees argue that these sales should not be subject to the strictures of the Robinson-Patman Act because the sales are so minor as to be a de minimis violation of the Act. The district court agreed with the appellees, citing to the fact that appellees' sales of drugs to non-members constituted less than one percent of appellees' total sales of drugs.
 
 
 22
 We do not believe, however, that a court can determine whether or not certain sales are de minimis solely by reference to the percentage of an organization's total sales they constitute. The term de minimis generally refers to the effect of a violation, not to the proportion of a party's conduct which violates the law as compared to that which does not. One percent of appellees' total sales might amount to a substantial dollar volume with a dramatic effect on the ability of the relatively small retail drug stores to compete. We, therefore, remand this case to the district court for an evaluation of the impact of appellees' non-exempt sales on competition in the retail drug market.[8]
 
 III. THE ATTEMPTED MONOPOLIZATION CLAIM
 
 23
 To establish a claim for attempted monopolization, a plaintiff must show that the defendant had a specific intent to monopolize the market, that there was a dangerous probability that the attempt might succeed, and that the defendant committed acts designed to achieve the illegal objective of creating a monopoly. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1027 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982).
 
 
 24
 We find that appellants failed to raise a genuine issue of material fact on the question whether the appellees engaged in acts designed to monopolize the market for retail drugs. The only evidence offered by appellants in opposing appellees' motion for summary judgment shows merely that the appellees drove hard bargains with pharmaceutical companies and obtained the best prices possible.[9] Appellants offered no evidence of predatory intent, such as proof that appellees coerced pharmaceutical companies into selling drugs to them below cost, or that appellees, in turn, sold drugs to their members below the cost of acquiring the drugs. Nor did appellants present any evidence that appellees coerced pharmaceutical companies into harming appellants. Accordingly, summary judgment was properly granted on this claim.
 
 IV. THE TIE-IN CLAIM
 
 25
 To establish a tying claim, a plaintiff must first demonstrate that the defendant is selling two distinct products as a package. He must then show that the defendant has sufficient power in the market for one product (the tying product) to encourage consumers to buy the other product (the tied product) when they might not ordinarily do so. See Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan, 662 F.2d 641, 648 (9th Cir.1981).
 
 
 26
 Appellants claim that appellees have made three such tying arrangements. All of these arrangements involve the drug plan that appellees sell to members. The first alleged tying arrangement is between the drug plan (the tied product) and the basic health plan (the tying product). The second is the converse arrangement between the health plan (the tied product) and the drug plan (the tying product). The third is between the drugs sold at appellees' facilities (the tied product) and the drug plan (the tying product).
 
 
 27
 None of these contentions is meritorious. The first alleged arrangement is not an illegal tie-in because appellees do not require that one purchase the drug plan to obtain the health plan. Appellants have no standing to attack the second alleged arrangement because they are not competitors in the market for the tied product, health plans. See Aurora Enterprises, Inc. v. National Broadcasting Co., Inc., 688 F.2d 689 (9th Cir.1982) (only consumers and competitors in the market for the tied product have standing to bring suit). Nor can appellants succeed on their third contention because we have already rejected the theory that a drug plan and the drugs provided under that plan are separate commodities for purposes of the Clayton Act. Klamath Lake Pharmaceutical Assn. v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1288-90 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).
 
 V. CONCLUSION
 
 28
 In sum, we affirm the district court's grant of summary judgment with respect to the claim of attempted monopolization and the tie-in claim. We also affirm the district court's conclusion that drug purchases made by appellees for resale to their members are exempt from the Robinson-Patman Act under the exception created by the Nonprofit Institutions Act. We reverse, however, the district court's determination that appellees' sales of drugs to non-members constituted a de minimis violation of the Robinson-Patman Act, and we remand to the district court for reconsideration of this question.
 
 
 29
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.[10]
 
 
 
 *
 Honorable Samuel P. King, Chief U.S. District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Before 1977, the Kaiser appellees were organized in a slightly different manner. The pharmacies located outside of the hospitals were not operated by the regional HP's but by regional Permanente Service Corporations. These nonprofit corporations were formed because the Internal Revenue Service stated that the regional health plans would not be considered charitable organizations under the Internal Revenue Code if they ran the pharmacies. The Permanente Service Corporations, however, returned all receipts to the HP's less costs and a rate of return on capital. The Service Corporations paid taxes on the amount allocated for rate of return on capital and then paid the amount remaining to the HP's
 In 1977, the Internal Revenue Service declared that its denial of charitable status to health plans which operated pharmacies was erroneous. The Service Corporations were then disbanded and control of their pharmacies transferred directly to the HP's.
 Because the Internal Revenue Service stated that the Service Corporations should have been treated as charities for purposes of the Internal Revenue Code and because the Service Corporations engaged only in activities that the HP's currently engage in, we believe the analysis under the Robinson-Patman Act for sales by the Service Corporations is the same as that for sales by the HP's. Consequently, we will treat all sales at pharmacies located outside Kaiser hospitals as being sales made by the HP's even if some of those sales occurred before 1977 and were thus actually made by Service Corporations.
 
 
 [2]
 Actually, the summary judgment before us is the second one granted by the district court in this case. We reversed the first one--granted in 1978--on the ground that appellants should have received additional time for discovery before the motion for summary judgment was granted. Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan, 662 F.2d 641 (9th Cir.1981). On remand, the district court permitted discovery for as long as appellants requested
 
 
 [3]
 As already indicated, appellants assert a Robinson-Patman Act claim against all appellees, including the regional Permanente Medical Groups. The Medical Groups, however, do not sell drugs to members. Rather, they prescribe drugs which members purchase at one of the pharmacies operated by either an HP or Kaiser Hospitals. Because the Robinson-Patman Act governs only those who buy and sell at discriminatorily low prices, and not those who indirectly benefit from such purchases, see 15 U.S.C. Sec. 13a, appellants' claim against the Medical Groups must fail
 
 
 [4]
 A small portion of the payment to the Medical Groups--generally around five percent of the total payment--does not depend solely upon the number of members in the Medical Group's region. This portion is withheld by the HP and paid to the Medical Groups only if appellees meet their yearly financial goals. This system of payment is designed to give the doctors in the Medical Groups an incentive to keep costs low, and it is required by regulations promulgated pursuant to the Health Maintenance Organizations Act. 42 C.F.R. Sec. 110.104(b)(1)(v)
 
 
 [5]
 At this point, we can treat the HP's and Kaiser Hospitals as one organization for analytical purposes because whatever is in the "own use" of one part of a health maintenance organization would be in the "own use" of another. After all, whether a member purchases his drugs from a pharmacy run by a regional HP or one run by Kaiser Hospitals doubtless depends on the fortuity of which location is more convenient for the member
 Appellants argue, in effect, that we cannot consider the interest of Kaiser Hospitals in serving members because membership is a matter between the consumer and his regional HP and because the HP's and Kaiser Hospitals are distinct corporations. Appellant's Opening Brief at 12. But appellants have misapprehended the legal relevance of corporate structure. The cases they cite merely stand for the proposition that the presence of two or more corporations acting together is sufficient to satisfy the "combination, contract, or conspiracy" requirement which triggers the substantive provisions of section 1 of the Sherman Act.
 
 
 [6]
 The language of the Nonprofit Institutions Act speaks only to purchases by institutions for their own use. It says nothing about sales by such institutions. Abbott Labs, however, implicitly decided that whether an item purchased at a discriminatorily low price was purchased for the institution's own use depends on whether and how the item was resold. See generally 3 E. Kintner & J. Bauer, Federal Antitrust Law Sec. 25.9 (1983)
 
 
 [7]
 HMO's, such as the Kaiser-Permanente, can therefore engage in some sales that would not be allowed if we applied the ten categorical rules formulated in Abbott Labs to this case
 For instance, in Abbott Labs, the Court held that fee-for-service hospitals cannot purchase drugs at discriminatorily low prices if those drugs are sold to refill a prescription, even if the original prescription was filled as part of an exempt sale. 425 U.S. at 15-16, 96 S.Ct. at 1315. It appears that the Court declined to exempt prescription refills because the basic institutional function of a fee-for-service hospital is to provide temporary medical care for its patients. Refilling prescriptions goes beyond that basic institutional function because it extends the relationship between the fee-for-service hospital and the patient into the indefinite future. Id. at 16, 96 S.Ct. at 1315 (A prescription is not for the hospital's " 'own use' forever just because it originated under hospital auspices. We conclude that the statute's limitation has been exceeded when the connection with the hospital has become as attenuated as it is at the refill stage.").
 As we explained in text, however, the relationship between an HMO and its members is ongoing, not temporary. The relationship thus does not attenuate simply because the member stepped out the door of an HMO hospital some time ago. The HMO is consequently acting within its basic institutional function when it refills the prescription of a health plan member.
 
 
 [8]
 Appellees contend that they would cease sales to non-members if they were certain that doing so would not subject them to liability for violation of state licensing law, state tax law, or state rules of tort liability. This record, however, is not nearly sufficient to demonstrate that the operation of these state laws immunizes appellees' conduct under the standard for antitrust immunity set forth in California Retail Liquor Dealer's Ass'n v. Midcal Aluminum, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Nor have appellees made clear why closing the pharmacies to non-members would violate federal tax law, as they assert in their brief
 
 
 [9]
 To bolster their attempted monopolization claim, appellants filled their opening brief with references to an affidavit by Howard Steinbach. The district court ruled, however, that the information in that affidavit was not admissible because the affidavit contained nothing but conclusory statements and hearsay. We agree with the district court's ruling on this point and consequently do not consider the Steinbach affidavit
 
 
 [10]
 Appellants also made an emergency motion to strike portions of appellees' Excerpt of Record. We took this motion under submission with the rest of the case
 The portion of the Excerpt of Record which appellants wish to strike served as an important basis for the district court's factual findings in this case. It was thus proper for appellees to include it in their Excerpt of Record. Consequently, appellants' motion is denied.